**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

**COURTHOUSE NEWS SERVICE,**

     *Plaintiff,*

v.                             **Case No.: 4:22cv106-MW/MAF**

**BRENDA D. FORMAN,**
**et al.,**

     *Defendants.*

_____/

## PRELIMINARY INJUNCTION

In Broward County Circuit Court, most civil complaints are unavailable to the public the day they are filed. Plaintiff, Courthouse News Service, argues that this state of affairs violates its First Amendment right to timely access court documents. This Court must determine whether the First Amendment encompasses such a right, and whether the current delays in access violate it.

The eighteenth-century British politician Edmund Burke apocryphally said that "there were Three Estates in the Parliament; but, in the reporters' Gallery yonder, there sat a *fourth estate* more important far than they all." Slavko Splichal, *Principles of Publicity and Press Freedom* 44 (2002). Our Nation's founders thought as much, providing in the first amendment to the Constitution that "Congress shall make no

law . . . abridging the freedom of . . . the press." U.S. Const. amend. I. Indeed, the press is the *only* profession the Constitution expressly protects.

And "[a]s a check on the judiciary specifically, the media provides an outlet for 'public scrutiny of the justice system,' perhaps one of the greatest cornerstones of American democracy." Rachel Luberda, *The Fourth Branch of the Government: Evaluating the Media's Role in Overseeing the Independent Judiciary*, 22 Notre Dame J. L. Ethics & Pub. Pol'y 507, 513 (2008). Following this reasoning, the Supreme Court has found that the First Amendment provides a right of access to criminal proceedings. *See Press-Enter. Co. v. Superior Court* (*Press-Enterprise II*), 478 U.S. 1, 5 (1986). And a host of lower courts have extended that right to civil proceedings.

The Eleventh Circuit has likewise resolutely enforced the "presumption of public access" to court records, finding that the common law guarantees access to judicial records. *Callahan v. United Network for Organ Sharing*, 17 F.4th 1356, 1359 (11th Cir. 2021). But the Eleventh Circuit has yet to decide whether the First Amendment guarantees access to newly filed, non-confidential civil complaints, "the cornerstone of every case," to which "access . . . is almost always necessary if the public is to understand a court's decision." *F.T.C. v. AbbVie Prods. LLC*, 713 F.3d 54, 62 (11th Cir. 2013).

As explained below, the First Amendment guarantees such access, and Broward County's current system violates that right. Thus, Plaintiff's motion for a preliminary injunction is **GRANTED**.

I

Courthouse News Service reports mainly on "the law as it is developed and decided in American courthouses." ECF No. 35-1 ¶ 1. To that end, Courthouse News covers "state and federal trial and appellate courts in all 50 states." *Id.* ¶ 4. Courthouse News publishes articles on its own website and sells its reporting to other news outlets, such as the Associated Press, CNN, and Walt Disney. *Id.* ¶¶ 7, 9. The "majority of the nation's large and mid-sized law firms also subscribe to one or more of Courthouse News' publications," as do several universities. *Id.* ¶¶ 7–8.

Among its eight Florida newsletters, Courthouse News publishes the *Broward County Report*, "which reports on new litigation in Broward Circuit Court." *Id.* ¶ 5. "To prepare the new litigation newsletters and identify new cases that may warrant an article on Courthouse News' website, Courthouse News' reporters visit their assigned court, or visit the court's website where remote online access to documents is available." *Id.* ¶ 16.

In Florida, visiting the assigned court will not do much good; with a few exceptions, electronic filing is mandatory in Florida courts. *See In re Elec. Filing in the Sup. Ct. of Fla. via the Fla. Cts. E–Filing Portal*, Fla. Admin. Order No.

3

AOSC13–7, 4 (Feb. 18, 2013). The two Defendants in this case—the Chair of the Florida E-Filing Authority,[1] Chair Rushing, and the Broward County Clerk of Courts, Clerk Forman—both play a role in the e-filing process.

All filings begin at Florida's E-Filing Portal. The Authority developed, owns, and governs the Portal. ECF No. 43-1 ¶ 2. Parties access the portal through www.myflcourtaccess.com. *See* ECF No. 35-3 ¶ 8. Before filing a complaint, the filer must enter case information such as the relevant jurisdiction, the type of lawsuit, party details, claim amounts, remedies sought, and whether the complaint contains confidential information. *Id.* at 8–24. Then, before uploading the complaint, the filer is reminded of their sole responsibility to ensure the redaction of confidential information. *Id.* at 25. Once a complaint is received through the Portal, the Authority processes it by "stamp[ing] the filing with the official file stamp date and time" and sending "a Notice of Electronic Filing . . . to all parties selected on the E-Service list for that court case." ECF No. 43-1 ¶ 3. After the Authority processes the complaint, it transmits the complaint "to the selected county for review and processing." *Id.* ¶ 4. Despite all the information gathered during submission, the Authority only filters complaints by county and does not separate confidential filings from non-

---

[1] The Authority was created in 2010 through an Interlocal Agreement reached among the Florida Clerks of Court. *Id.* at 7. The Authority is governed by a Board of Directors, which consists of the Chair (Chair Rushing), seven Clerks of the Circuit Court, and the Clerk of the Florida Supreme Court. ECF No. 26-1 at 6.

confidential filings. *Id.* The Authority simply transmits each complaint "in the order in which it is received." *Id.* ¶ 3. "Generally speaking," it takes "no longer than 5 minutes" to process and transmit a complaint from the Portal to the appropriate clerk of court. *Id.* ¶ 8.

Once the county clerk receives the complaint, further processing is done in one of two ways: Local Review or Portal Review. *Id.* Under Local Review, "the filing is submitted to that particular jurisdiction's review queue and the Portal's involvement ends there until after the county has completed its processing and accepted the submission, at which point the Portal receives a notification with the date and time of that completion." *Id.* ¶ 5. Under Portal Review, "the county will review the filing within the Portal review queue to ensure all documents in the filing can be automatically accepted, i.e., that the documents are formatted properly, contain the correct case style, and have the correct case number, among other things. If they can, the county accepts the filing, and it is then transmitted to the jurisdiction's CMS." *Id.* ¶ 6. Broward County uses Local Review. *Id.* ¶ 9.

Traditionally, as part of their review—whether Portal or Local—clerks had to sift through filings for confidential information. *See In re Amends. to Fla. Rule of Jud. Admin. 2.420*, 320 So. 3d 626, 627 (Fla. 2021). But, responding to media complaints of "concerning delays in . . . access to nonconfidential court records," the Florida Supreme Court modified the Florida Rules of Judicial Administration to

provide "that, in certain civil cases, the clerk of court does not have an independent responsibility to identify and designate information as confidential. Instead, that is the sole responsibility of the filer." *Id.*; *see also* ECF No. 46-3 (Defendant Forman's notice to filers that "[e]ffective July 1, 2021, filers will be solely responsible for ensuring any confidential information contained in filings . . . is appropriately redacted").

Now, clerks need not "designate and maintain information as confidential unless the filer" follows the procedures for marking a filing as confidential. Fla. R. Gen. Prac. & Jud. Admin. 2.420(D)(1)(c). Yet, as noted above, although filings are marked as confidential or non-confidential when filed, "the Portal does not separate confidential filings from non-confidential filings." ECF No. 43-1 ¶ 11. "That is done by each individual clerk at the review stage." *Id.*

Both before and after the current system came into effect, delays in access have plagued Broward County. In 2018, the News Media Coalition prepared a report—based on observations by one of Plaintiff's reporters—criticizing Florida's court system for delays in access to court documents. ECF No. 35-2 at 45–53. In response, the Florida clerks issued a rebuttal arguing that the delays were justified by the time it takes "to docket and . . . redact" documents. *Id.* at 68. The clerks further stated that Broward County met "performance standards for timeliness; i.e., two days for case filings and three days for supplemental filings 80 percent of the time." ECF

No. 1-3 at 7. Defendant Forman still follows these standards. ECF No. 44 at 19; ECF No. 44-6 at 5.

More recently, from August 2021 to February 2022, Plaintiff tracked public access to civil complaints in Broward County. ECF No. 35-2 ¶ 20. Based on this data, 13% of complaints are available the day they are filed, 44% a day after filing, 14% two days after filing, and 29% three or more days after filing. *Id.* Thus, 87% of complaints are unavailable the day they are filed and 43% are unavailable for two days or more. *Id.* ¶ 22. Defendants have not challenged this data's accuracy.

Such delays seriously hamper Plaintiff's ability to report on lawsuits in Broward County. "News runs on a daily cycle where events occur during the day and are reported that day." ECF No. 35-1 ¶ 14. Or, as Plaintiff more colorfully put it, it's called "news" not "olds." ECF No. 35 at 46. Thus, by the time Plaintiff learns of many of the civil complaints filed in Broward County, their newsworthiness has already faded.

After unsuccessfully attempting to negotiate a solution with Defendants, Plaintiff filed this lawsuit. *See* ECF No. 1. Plaintiff brings one count against both Defendants, seeking declaratory and injunctive relief for First Amendment violations through 42 U.S.C. § 1983. Plaintiff then moved for a preliminary injunction. ECF No. 35. Both Defendants responded in opposition, and this Court

held a hearing on the motion on May 12, 2022. With this background in mind, this Court turns to Plaintiff's motion, starting with some threshold issues.

## II

At the hearing, Defendant Forman raised three threshold issues, quasi-judicial immunity, failure to join indispensable parties, and abstention.[2] This Court already rejected those arguments when it ruled on Defendant Forman's motion to dismiss, *see* ECF No. 45, and it adopts and incorporates that order's reasoning here.[3]

This Court pauses only to readdress Defendant Forman's abstention argument. Abstention is "the exception, not the rule." *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984). And "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996).

Yet in the leading case abstaining under these circumstances, *Courthouse News Service v. Brown*, the Seventh Circuit conceded that this situation does not fit *any* recognized abstention doctrine, and instead based its decision "on the more

---

[2] Defendants do not argue that Plaintiff lacks standing, but it remains a threshold matter that this Court must decide before addressing Plaintiff's claim. *E.g.*, *Via Mat Int'l S. Am. Ltd. v. United States*, 446 F.3d 1258, 1262 (11th Cir. 2006). This Court has independently considered the issue and determines that Plaintiff has standing.

[3] By incorporating that order by reference, this Court does not mean to suggest that these issues are unimportant. To the contrary, this Court readily acknowledges their critical importance. That said, copying and pasting a 26-page order into this Order would only serve to muddle this Court's analysis on the remaining issues.

general principles of federalism that underlie all of the abstention doctrines." 908 F.3d 1063, 1071 (7th Cir. 2018). As other courts have noted, *Brown* is an outlier. *See Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 325 n.2 (4th Cir. 2021); *Courthouse News Serv. v. Planet* (*Planet III*), 947 F.3d 581, 591 n.4 (9th Cir. 2020); *Courthouse News Serv. v. Gabel*, 2:21-CV-000132, 2021 WL 5416650, at *11 (D. Vt. Nov. 19, 2021). And for good reason. This Court may abstain only if the case before it falls within a specific category of abstention recognized by the Supreme Court. *Schaefer*, 2 F.4th at 324. That a case makes a judge's "federalism senses" tingle is not enough. *Brown* is thus unpersuasive. In short, this Court remains convinced that abstention is unwarranted. Having so concluded, this Court turns to the merits of Plaintiff's motion.

III

A district court may grant a preliminary injunction if the movant shows: "(1) it has a substantial likelihood of success on the merits;" (2) it will suffer irreparable injury "unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Although a "preliminary injunction is an extraordinary and drastic remedy," it should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites."

*United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). No one factor, however, is controlling; this Court must consider the factors jointly, and a strong showing on one factor may compensate for a weaker showing on another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). Finally, "[a]lthough the initial burden of persuasion is on the moving party, the ultimate burden is on the party who would have the burden at trial." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (citing *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)). Applying this standard, this Court first considers whether Plaintiff has established a likelihood of success on the merits.

A

This Court begins with whether Plaintiff has shown a substantial likelihood of success on the merits. This Court addresses this factor first because, typically, if Plaintiff cannot "establish a likelihood of success on the merits," this Court "need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). This Court must begin its merits analysis by considering whether the First Amendment encompasses a right of access to non-confidential civil complaints.

1

Defendants concede that the First Amendment provides *some* right of access to civil complaints. *See* Tr. at 21 ("[T]he Broward Clerk of Court is not here to suggest that there is no First Amendment right of access to nonconfidential circuit civil complaints."); ECF No. 43 at 15 (asserting that "[t]he Authority does not dispute that newly filed non-confidential complaints have historically been open to the press and general public" or "that public access to these types of documents is important").[4] Still, this Court briefly addresses the issue.

Under the applicable "experience and logic" test, "[t]he First Amendment provides a right of access to a judicial proceeding or record: (1) that 'ha[s] historically been open to the press and general public;' and (2) where 'public access plays a significant positive role in the functioning of the particular process in question.' " *Schaefer*, 2 F.4th at 326 (quoting *Press-Enterprise II*, 478 U.S. at 8–10). When both prongs are met, a qualified First Amendment right attaches. *Id.*

---

[4] This Court notes, however, that in her response to Plaintiff's complaint—filed after the preliminary injunction hearing—Defendant Rushing asserts that she "has not historically provided public access to court filings and therefore, pursuant to the 'experience and logic' test . . . no First Amendment right attaches to those filings." ECF No. 55 at 13. This argument applies the experience and logic test far too narrowly. Under Defendant Rushing's theory, if one actor had a history of denying access—even if, across the county, all others granted access—no right of access would exist. Plus, every time, as here, new technology changes the method through which access is granted, any First Amendment right of access would evaporate because public access had not "historically" been provided through that technology. For these reasons, this Court rejects Defendant Rushing's narrow application of the experience and logic test.

Starting with experience, Plaintiff has provided an uncontested declaration attesting to the fact that—before e-filing—newly filed civil complaints were generally accessible in person the day they were filed. ECF No. 35-1 ¶¶ 17–29. Plus, as the Eleventh Circuit has noted, "access to judicial proceedings is crucial to our tradition and history." *Callahan*, 17 F.4th at 1359. In short, the experience prong favors a right to access.

And as for logic, Defendant Rushing concedes "that public access . . . is important." ECF No. 43 at 15. This Court agrees. In finding that a common-law right of access attaches to civil complaints, the Eleventh Circuit explained that such access "is 'an essential component of our system of justice' and 'is instrumental in securing the integrity of the process.' " *AbbVie*, 713 F.3d at 62 (quoting *Chi. Trib. Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir. 2001)). Indeed, as noted above, press coverage of judicial proceedings is a "cornerstone[] of American democracy." Luberda, *supra*, at 513. In short, experience teaches that public access plays a significant positive role in the function of civil court proceedings. Thus, under the experience and logic test, a qualified First Amendment right of access applies to non-confidential civil complaints.

2

Having recognized a qualified First Amendment right to access civil complaints, this Court must next determine when the right attaches. Plaintiff argues

that the right attaches the moment the Authority receives a complaint. Tr. at 6. But Defendant Rushing implies that the right attaches after the Authority has passed the complaint along to the local clerk.[5] This is so, she says, because Florida Rule of General Practice and Judicial Administration 2.420(b)(1)(A) defines "court records" as "the contents of the court file." In other words, complaints do not become "court records" until Defendant Forman receives them and makes them part of the "court file," and the right of access does not attach until the complaints become "court records."

But it is the moment a document is filed, not the moment Florida labels it a "court record," that matters. Defendant Rushing cannot rely on the Florida Rules of Judicial Administration because how state law defines "court record" cannot dictate the First Amendment's scope. *See NAACP v. Button*, 371 U.S. 415, 429 (1963) ("[A] State cannot foreclose the exercise of constitutional rights by mere labels."). Rather, experience and logic define the First Amendment right's contours. Here, both experience and logic suggest that the right of access attaches upon filing.

*First*, experience suggests that the right attaches upon filing. The First Amendment right of access guarantees "something in line with what the press has traditionally enjoyed." *See Courthouse News Serv. v. N.M. Admin. Off. of the Cts.*,

---

[5] Defendant Forman, on the other hand, does not seriously engage with this issue—or, for that matter, with most merits issues.

CIV 21-0710 JB/LF, 2021 WL 4710644, at *39 (D.N.M. Oct. 8, 2021). And the press traditionally enjoyed on-receipt access to unprocessed complaints that the clerk had stamped as received but not yet docketed. *See* ECF No. 35-1 ¶ 18 (explaining that "Florida state courts, including high volume courts in Miami, Orlando, Palm Beach and Tampa, provided . . . public access on receipt to paper filings"). Thus, the experience prong suggests that the right attaches upon filing.

*Second*, logic also suggests that the right attaches upon filing. As many courts have explained, complaints "instantaneously invoke[] a court's jurisdiction," trigger legal obligations, and impact parties' "substantive legal rights and duties." *Schaefer*, 2 F.4th at 328. "The press and public thus have an important interest in reasonably contemporaneous access to civil complaints." *Id.*; *cf. Planet III*, 947 F.3d at 592 ("Public access to civil complaints before judicial action . . . buttresses the institutional integrity of the judiciary."). Because public access upon filing facilitates public scrutiny of the court system, it plays a significant positive role in the function of civil court proceedings. Logic thus favors access upon filing.

In sum, the press has traditionally had access to complaints just after they were filed. Plus, complaints have public importance the moment they are filed. The First Amendment right of access thus attaches at that time.

*      *      *

Nearly every court that has passed on the issue has found that the press and public enjoy a First Amendment right to access civil complaints that attaches upon filing. *See, e.g.*, *Schaefer*, 2 F.4th at 328; *Planet III*, 947 F.3d at 594; *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 141 (2d Cir. 2016); *cf. Courthouse News Serv. v. Quinlan*, 32 F.4th 15, 20 (1st Cir. 2022) (noting that the parties did not contest the issue). Having considered, as those courts did, both experience and logic, this Court agrees. Now, this Court turns to whether the current scheme in Broward County violates that right.

3

Having determined that Plaintiff has a qualified First Amendment right of access to non-confidential civil complaints which attaches at the moment of filing, the next question is whether Defendants have violated that right.

Plaintiff argues that both Defendants have violated its First Amendment right by delaying access to Broward County civil complaints through the current e-filing scheme. ECF No. 35 at 40; ECF No. 53 at 6. Defendant Rushing, while conceding that Plaintiff has the First Amendment right of access, maintains that her office transmits new filings to Defendant Forman almost immediately upon filing, and has no control over access or processing past this point. ECF No. 43 at 16. Thus, according to Defendant Rushing, any delay in access—and any First Amendment

15

violation—is solely attributable to Defendant Forman. *Id.* Defendant Forman, on the other hand, frames the alleged constitutional violation more precisely as the lack of a public review queue available at the time of filing. ECF No. 44 at 24–25. Hence, Defendant Forman concludes, any First Amendment violation stems from Defendant Rushing withholding access at the Portal, not from Defendant Forman's processing. *Id.*

To properly address these arguments and determine whether Plaintiff's First Amendment right has been violated, this Court must resolve three discrete questions. First, whether there has been a delay in access to non-confidential civil complaints in Broward County triggering constitutional scrutiny. Second, who is responsible for the delay, if any. Finally, whether the delay is constitutionally permissible.

a

First, there is a delay in access stemming from Florida's serpentine e-filing system. As explained above, the public cannot access non-confidential civil complaints in Broward County until Defendant Forman completes clerical processing. In most cases, one day or more passes between filing and access. While some complaints are made available on the filing date, it is exceedingly rare. Moreover, in those rare instances of same-day access, the temporal lapse between filing and access remains unknown, and there has been no indication that such access is contemporaneous with filing.

16

The parties agree that Broward County does not provide instant, immediate, or even contemporaneous access. Indeed, Defendant Forman readily admits that her office's goal, under the applicable Florida standards, is to provide access two days after filing. The parties do quibble over whether the current practice constitutes a "delay," however. *See* Tr. at 60–62. More specifically, in this First Amendment context, the parties dispute that there is a delay in access triggering constitutional scrutiny. *See, e.g.*, *Planet III*, 947 F.3d at 596 (subjecting delay denying "immediate access" to intermediate scrutiny); *Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532, 560 (E.D. Va. 2020) (shifting burden to the defendant to justify access policy after finding "that delays in access occurred").

This Court finds that there has been such a delay in access. Other courts around the country have applied constitutional scrutiny to delays of 24 business hours[6] after filing, *Quinlan*, 32 F.4th at 21, delays beyond the filing date, *Schaefer*, 2 F.4th at 328–29, delays beyond five business hours after filing, *N.M. Admin. Off. of the Cts.*, 2021 WL 4710644, at *41, and any delay beyond "immediate access," *Planet III*, 947 F.3d at 596. *See also Gabel*, 2021 WL 5416650, at *14 ("Although some courts have sought to impose a bright-line rule for permissible delay, here the focus must be on whether *any* delay is appropriate because any restriction on the First Amendment right of access must have 'sufficient justification.' "). Here, under

---

[6] Yes, business hours are a real thing.

17

any standard, there is a delay because complaints are almost always unavailable until at least one day after filing. Moreover, Defendants' practice of processing each incoming complaint before furnishing access necessarily precludes immediate access. Having found a delay triggering constitutional scrutiny, this Court must determine who is responsible for the delay and whether it is constitutionally justifiable.

b

There is a clearly a delay in accessing non-confidential civil complaints in Broward County. But to determine whether this delay amounts to a constitutional violation, this Court must first ascertain its source. Plaintiff argues that Defendants mutually maintain "no-access-before-process" policies which unconstitutionally delay access to complaints in Broward County. ECF No. 35 at 41. Much of the delay, Plaintiff argues, is caused by Defendant Forman unnecessarily sorting and processing non-confidential complaints before posting them. *Id.* at 41–42. Plaintiff maintains that Defendant Rushing is also to blame, however, because litigants are required to file Broward County complaints through the Portal and her method of transmitting filings without filtering forces Defendant Forman to separate the confidential filings upon receipt, thereby exacerbating the delay. ECF No. 46 at 14; ECF No. 53 at 5–7. Thus, in Plaintiff's view, "Chair Rushing's behavior is

18

inextricably intertwined with the routine withholding of public complaints." ECF No. 53 at 14.

Defendants deflect these arguments by pointing fingers at each other. Defendant Rushing—originally analogizing the Portal to a mailbox, ECF No. 43 at 8, and later to a "pathway," ECF No. 52 at 4—insists that she only has control over filings during the near-immediate sequence of filing and transmission to Defendant Forman, and any delay occurs during processing when the filings are in Defendant Forman's exclusive control. ECF No. 43 at 7–9, 16. Defendant Forman likewise shifts the blame back to Defendant Rushing, arguing that if filing triggers the First Amendment right of access, then the injury occurs just after—when the complaints are in Defendant Rushing's exclusive control at the Portal. ECF No. 44 at 23–25, 27–28, 32–33. Thus, to Defendant Forman, Plaintiff's alleged injury results from Defendant Rushing denying access to complaints at the Portal, not from Defendant Forman's actions. *Id.* at 25.

Under *Ex parte Young*, "[p]ersonal action by defendants individually is not a necessary condition of injunctive relief," and "[a]ll that is required is that the official be responsible for the challenged action." *Luckey v. Harris*, 860 F.2d 1012, 1015 (11th Cir. 1988). "[I]t is sufficient that the state officer sued must, 'by virtue of his office, ha[ve] some connection' with the unconstitutional act or conduct complained

of." *Id.* at 1015–16 (second alteration in original) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)).

Applying that standard, this Court finds that both Defendants delay access to non-confidential complaints in Broward County. Temporally speaking, most of the delay occurs while the filings are in Defendant Forman's possession. Defendant Rushing transmits new filings to Defendant Forman's review queue within, at most, five minutes of submission. Once in the review queue, the complaints languish for often days at a time until Defendant Forman completes processing. While Defendant Forman has avoided discussing exactly what "processing" entails, *see* Tr. at 23:11–24:25, 27:13–24, 32:18–25, 34:1–15, 60:7–13, the evidence before this Court suggests that processing involves reviewing and redacting confidential information from complaints. *See* ECF No. 35-2 ¶ 15; *see also Amendments to Rule 2.420*, 320 So. 3d at 627 n.1 ("[T]he primary reason for the delays is because the clerks of court are responsible for reviewing and redacting every filing prior to allowing access."). After completing processing, Defendant Forman uploads the complaints for public view.

If complaints became publicly available when they hit Defendant Forman's review queue, the public would have near-instant access. Instead, Defendant Forman shields complaints from public view until her office processes them. Defendant Forman thus delays access to complaints in Broward County. Against Defendant

Forman's suggestion, she is not absolved of responsibility just because the First Amendment right attaches when complaints are in Defendant Rushing's control. Even if Defendant Rushing is responsible for the initial delay by denying access to complaints at the Portal, Defendant Forman only prolongs the delay through her processing policy. Thus, Defendant Forman has more than " 'some connection' with the unconstitutional act or conduct complained of." *Luckey*, 860 F.2d at 1015–16 (quoting *Ex parte Young*, 209 U.S. at 157).

At any rate, Defendant Rushing is also responsible for the delay, although that analysis is more nuanced. Defendant Forman's current practice begs the question: why does she review incoming complaints for confidential information when the Florida Supreme Court relieved her of this very task? Well, with respect to Rule 2.420, it is true that the amendment "eliminate[d] the requirement that the clerk of court independently designate as confidential information filed in certain civil cases." *Amendments to Rule 2.420*, 320 So. 3d at 626. Notwithstanding this amendment, Rule 2.420 still requires clerks to designate and maintain confidential information when the filer files a Rule 2.420(d)(2) notice or Rule 2.420(d)(3) motion, the filing is deemed confidential by court order, or the case is deemed confidential by law. *Id.* at 627. Thus, while Defendant Forman no longer has an independent responsibility to review most filings for confidential information, she still must maintain the confidentiality of a small subset of complaints.

21

In theory, this amendment should greatly expedite access congruent with the Florida Supreme Court's intent. *See id.* ("[T]o address timely access to court records, we now amend subdivision (d)(1) to provide that, in certain civil cases, the clerk of court does not have an independent responsibility to identify and designate information as confidential."). In Broward County, however, little has changed.

This is where Defendant Rushing enters the picture. Defendant Rushing blindly transmits complaints to Defendant Forman's review queue in the order in which they are filed. As a result, all complaints—whether marked by the filer as confidential or not—land in the same queue. Facing a batch of unmarked complaints, then, Defendant Forman sorts through each complaint to determine whether it fits within the "limited group of civil cases" that must be marked confidential under Rule 2.420. *Id.* Thus, at the expense of timely access to most complaints, Defendant Forman's entire review process is driven by her responsibility toward a minority of cases. In other words, the exception is swallowing the rule.

The heart of the problem is Defendant Rushing's transmission protocol. Despite collecting a wealth of data from the filer at the intake stage, Defendant Rushing only filters complaints by county. By way of analogy, Defendant Rushing's practice mirrors the "end-to-end" Internet design principle, where "packets are delivered on a first-come, first-served basis without regard to their content, origin, or destination and are free from any intermediate error checking or filtering."

Jonathan E. Nuechterlein & Philip J. Weiser, *Digital Crossroads: Telecommunications Law and Policy in the Internet Age* 168 (2d ed. 2013). Under that model, IP networks remain "dumb," in that they do not "know" packet contents, treat all packets the same, and leave the "intelligence" to the end users. *Id.* at 197.

So too here, where Defendant Rushing remains "dumb" to all complaint contents and treats every Broward County complaint the same. And while this may be a sublime model for a free and open Internet, it is hardly an efficient framework for an e-filing system. Using the information collected during intake, Defendant Rushing could, for example, filter, separate, or otherwise designate confidential complaints for Defendant Forman before transmission. That way Defendant Forman could identify, before processing, the non-confidential complaints and greatly expedite public access. But because Defendant Rushing dumps all Broward County complaints into the review queue without regard for confidentiality, Defendant Forman reviews each complaint for confidential information when she otherwise would not under Rule 2.420. As a result, non-confidential complaints are further concealed from public view.

It is no answer, as Defendant Rushing argues, that the bulk of the delay is wrought by Defendant Forman's processing. As shown above, Defendant Forman's processing delays access precisely because Defendant Rushing disseminates complaints in this rudimentary manner. Moreover, as the state officer charged with

23

receiving filings and maintaining Florida's e-filing system, Defendant Rushing certainly has "some connection" with the alleged constitutional injury stemming from that system. *Luckey*, 860 F.2d at 1015–16. Thus, Defendant Rushing helps create and compound the delays in Broward County.

For the reasons articulated above, both Defendant Rushing and Defendant Forman are responsible for the delays in access in Broward County. Given the "unique" structure of Florida's e-filing system, ECF No. 43 at 8; *see also* ECF No. 43-1 ¶ 11 ("Portal staff is unaware of any other state that uses an entity such as the Authority to operate an e-filing portal."), it comes as no surprise to this Court that the Defendants' litigation tactic is to point fingers, as illustrated below.



Fig. 1. Clerk Forman and Chair Rushing[7]

Neither can escape liability by shifting blame to each other, nor can they evade constitutional scrutiny by maintaining an administrative labyrinth. The way

---

[7] As one pop-culture commentator explains, "[t]he image of the two pointing Spider-Men has been captioned—and sometimes recreated—in all sorts of different ways. It's been around since at least 2011. It's been used by fans, celebrities and even politicians to make funny comparisons between people that either seem oddly similar or are engaged in the same activity." Nicholas Raymond, *The Origin of The Spider-Man Pointing Meme*, Screen Rant (Jan. 4, 2020), https://screenrant.com/spider-man-pointing-meme-cartoon-origin/.

Defendant Rushing transmits complaints creates the delay, and Defendant Forman's time-consuming review exacerbates the delay. Accordingly, both Defendants are responsible for the alleged constitutional violation.

c

Having found that there is a delay in access to Broward County complaints caused by both Defendants, the remaining question is whether Defendants' policies are constitutionally permissible. This Court finds that they are not.

Plaintiff urges this Court to measure Defendants' actions against the *Press-Enterprise II* test the Ninth Circuit articulated in *Planet III*, ECF No. 35 at 41, but neither Defendant argues which standard this Court should apply. Defendant Rushing, to her credit, provides a brief tour of the First Amendment jurisprudence in this area. ECF No. 43 at 12–16. But rather than meaningfully engage with the various standards deployed around the country, Defendant Rushing simply focuses on how courts have interpreted "timely access." *Id.*

Defendant Forman also fails to perform any constitutional analysis, or even acknowledge the First Amendment standards at play. *See* ECF No. 44. Instead, Defendant Forman devotes her response toward addressing the "judicial officer" argument under section 1983, *id.* at 10–14, abstention, *id.* at 14–19, *Monell*—when all agree that this is not a *Monell* case, *id.* at 19–29, the indispensable party argument, *id.* at 30–31, and the practical difficulties of granting relief, *id.* at 33–34. Of course,

25

this Court ruled on most of these arguments at the motion to dismiss stage, ECF No. 45, and at the hearing, this Court granted the parties an opportunity to file additional briefing, Tr. at 105–07. Defendant Rushing filed a response, ECF No. 52, though it lacks any constitutional analysis, and Defendant Forman filed nothing. Thus, in light of the parties' positions, or lack thereof, this Court now addresses which constitutional standard to apply.

i

Courts have applied a host of different standards in the First Amendment right of access context. Plaintiff's preference, again, is for this Court to apply the Ninth Circuit's iteration of the *Press-Enterprise II* balancing test from *Planet III*. In *Planet III*, the clerk's challenged policies were "content-neutral and affect[ed] only the timing of access to the newly filed complaints." 947 F.3d at 595. As such, the Ninth Circuit found that the policies "resemble[d] time, place, and manner restrictions" and declined to apply strict scrutiny. *Id.* at 595–96; *see also Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607 n.17 (1982) ("[L]imitations on the right of access that resemble 'time, place, and manner' restrictions on protected speech, would not be subjected to such strict scrutiny."). Instead, the Ninth Circuit applied the *Press-Enterprise II* balancing test, which the court described as "relaxed" or " 'rigorous,' but not strict scrutiny." 947 F.3d at 595–96 (quoting *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012)).

26

Under that standard, once the qualified First Amendment right of access has been established, a "presumption of access arises under *Press-Enterprise II* that may be restricted only if 'closure is essential to preserve higher values and is narrowly tailored to serve those interests.' " *Id.* at 594–95 (quoting *Press-Enterprise II*, 478 U.S. at 13–14). If a sufficient interest is offered, the policy is subject to further balancing. *See Press-Enterprise II*, 478 U.S. at 14 (deploying further balancing "[i]f the interest asserted is the right of the accused to a fair trial"). In *Planet III*, for example, the clerk's asserted interest in delaying access to complaints was "the fair and orderly administration of justice." 947 F.3d at 596. The Ninth Circuit then subjected that interest to the two-prong *Press-Enterprise II* balancing test, requiring the clerk's office to demonstrate, "first that there is a 'substantial probability' that its interest in the fair and orderly administration of justice would be impaired by immediate access, and second, that no reasonable alternatives exist to 'adequately protect' that government interest." *Id.* (quoting *Press-Enterprise II*, 478 U.S. at 14).

Other courts have similarly applied the *Press-Enterprise II* balancing test to determine the constitutionality of access delays resembling time, place, and manner restrictions. *See, e.g.*, *Gabel*, 2021 WL 5416650, at *13–14; *N.M. Admin. Off. of the Cts.*, 2021 WL 4710644, at *41–42.

Yet some courts, while treating policies restricting access to newly filed complaints as time, place, and manner restrictions, have applied different standards.

27

The Fourth Circuit, citing *Planet III*, found that "[t]he Clerks' practices do indeed resemble time, place, and manner restrictions, so we apply more relaxed scrutiny." *Schaefer*, 2 F.4th at 328 (citing *Planet III*, 947 F.3d at 595). Unlike the Ninth Circuit, however, the Fourth Circuit did not apply the *Press-Enterprise II* balancing test. Instead, quoting *Planet III*'s introduction, the Fourth Circuit stated that relaxed scrutiny "requires that delays in access be 'content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice.' " *Id.* (quoting *Planet III*, 947 F.3d at 585). Upon applying such scrutiny, the Fourth Circuit affirmed Judge Morgan's ruling that the clerks violated the First Amendment right of access to newly filed complaints. *Id.* at 328–29.

In the lower court ruling, Judge Morgan actually applied strict scrutiny due to Fourth Circuit precedent at the time. *Schaefer*, 440 F. Supp. 3d at 560. Still, Judge Morgan noted that the clerks' practices would be unconstitutional under intermediate scrutiny. *Id.* As for the intermediate scrutiny standard, Judge Morgan deployed the traditional time, place, and manner test, stating that "the party seeking to restrict access . . . must show that the restriction is necessitated by a significant interest, [is] narrowly tailored to further that interest, and leave open ample alternative channels of communication." *Id.* (citing *Reynolds v. Middleton*, 779 F.3d 222, 227 (4th Cir. 2015)).

28

Courts, including the Eleventh Circuit, have long applied this traditional time, place, and manner standard to restrictions on speech in public fora. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *Henderson v. McMurray*, 987 F.3d 997, 1002 (11th Cir. 2021). Of course, the Eleventh Circuit has only deployed this test in speech cases, and because it has yet to address whether a qualified First Amendment right of access to civil complaints even exists, it is unclear whether the Eleventh Circuit would use this test in access cases as well. Indeed, in *Planet III*, the majority criticized the concurring judge for applying the traditional time, place, and manner test because it applies to speech restrictions in a public forum, which a courthouse is not, and that standard seems inapposite where the right of access, not speech, is concerned. 947 F.3d at 596 n.9.

Finally, in *Quinlan*, the First Circuit found that the plaintiffs plausibly alleged a First Amendment violation under either strict or intermediate scrutiny. 32 F.4th at 20–21. Interestingly, for strict scrutiny, the First Circuit cited the *Press-Enterprise II* test, and for intermediate scrutiny, the court applied the traditional time, place, and manner framework. *Id.* Ultimately, because the defendants' policy failed under intermediate scrutiny, the court declined to address which standard applied. *Id.* at 21. Still, the First Circuit's discussion of scrutiny adds an interesting wrinkle into the web of First Amendment access jurisprudence.

29

In sum, courts around the country have applied differing standards in these cases. As the Eleventh Circuit has not weighed in on the matter, this Court must make sense of this quagmire. It is clear, however, that courts have consistently applied at least intermediate scrutiny when the qualified First Amendment right of access to civil complaints is at stake.

And these cases applying intermediate scrutiny fall into roughly three strands. The first strand is the Ninth Circuit's approach in *Planet III*, where access restrictions face "rigorous" or "relaxed" scrutiny under the *Press-Enterprise II* balancing test. 947 F.3d at 595–96; *Gabel*, 2021 WL 5416650, at *13–14; *N.M. Admin. Off. of the Cts.*, 2021 WL 4710644, at *41–42. The second strand is the Fourth Circuit's approach in *Schaefer*, where access restrictions still face "relaxed" scrutiny, but through a modified time, place, and manner framework instead. 2 F.4th at 328. Finally, the third strand of cases subject access restrictions to the traditional time, place, and manner framework for speech restrictions in public fora. *Quinlan*, 32 F.4th at 20–21; *Planet III*, 947 F.3d at 601–03 (Smith, J., concurring); *Schaefer*, 440 F. Supp. 3d at 560.

While Plaintiff urges this Court to adopt the Ninth Circuit's approach, the national variance on this issue together with the Eleventh Circuit's silence caution this Court against endorsing a particular standard. Fortunately, as shown below,

Defendants' policies fail under all three standards. Accordingly, this Court need not determine which standard applies.

To begin, this Court agrees with the reasoning under all three standards that Defendants' policies do not warrant strict scrutiny. In *Globe Newspaper Co.*, the Court noted that "limitations on the right of access that resemble 'time, place, and manner' restrictions on protected speech would not be subjected to such strict scrutiny." 457 U.S. at 607 n.17 (citations omitted). Here, there is no allegation that Defendants discriminate in granting access to Broward County complaints, or that Defendants deny access altogether. Rather, like the policies in *Planet III*, Defendants' policies are "content-neutral and affect only the timing of access to the newly filed complaints." 947 F.3d at 595. Accordingly, Defendants' practices mirror time, place, and manner restrictions and as such, do not warrant strict scrutiny.

Having established this footing, this Court next analyzes Defendants' practices under all three approaches. Before diving in, however, one final note is in order. Because Defendant Rushing has dealt with the First Amendment analysis at arm's-length and Defendant Forman hardly acknowledges it, neither Defendant has articulated why their policies are constitutional or how they would survive any level of scrutiny. Thus, with arguments coming from only one side, this Court's analysis can only be so thorough.

Moreover, neither Defendant has asserted *any* government interest that justifies or is furthered by delaying access to complaints. Defendant Forman offered the closest thing to a justification, explaining at the hearing that her process for handling complaints is prescribed by Florida law, and her "customs and practices" are in accordance with statutory mandates. Tr. at 23:22–25:1. But this is an excuse for the delay rather than an actual government interest. Indeed, both Defendants failed to cite the justification offered in many of these cases, "the fair and orderly administration of justice." *See, e.g.*, *Planet III*, 947 F.3d at 596; *Schaefer*, 2 F.4th at 328; *Gabel*, 2021 WL 5416650, at *13–14; *N.M. Admin. Off. of the Cts.*, 2021 WL 4710644, at *41–42. Both Defendants play an integral role in court operations and could plausibly assert this interest. As the Ninth Circuit stated:

> Even in this era of electronic filing systems, instantaneous public access to court filings, especially complaints, could impair the orderly filing and processing of cases with which clerk's offices are charged. After all, litigants are not uploading their complaints to the internet; they are filing them with a court, making them subject to judicial administration. The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press.

*Planet III*, 947 F.3d at 596. So, despite Defendants' silence on this score, because other courts have baked this interest into the constitutional analysis, and "the fair and orderly administration of justice" is a sensible value for Defendants, this Court will presume this interest is in play here as well. Now, onto the analysis.

ii

Under the Ninth Circuit's approach, having determined that Plaintiff has a qualified First Amendment right of access to newly filed non-confidential civil complaints that attaches at the time of filing, a presumption of access arises "that may be restricted only if 'closure is essential to preserve higher values and is narrowly tailored to serve those interests.' " *Planet III*, 947 F.3d at 594–95 (quoting *Press-Enterprise II*, 478 U.S. at 13–14). Again, neither Defendant has offered an interest justifying closure. But insofar as Defendants can channel the fair and orderly administration of justice, that interest suffices to overcome the presumption of access and subject Defendants' practices to the *Press-Enterprise II* balancing test. *See id.* at 595–96 (deeming "the fair and orderly administration of justice" to be a sufficient interest); *Gabel*, 2021 WL 5416650, at *13–14; *N.M. Admin. Off. of the Cts.*, 2021 WL 4710644, at *41–42.

Defendants' practices cannot be saved under the balancing test. Under the first prong, Defendants must demonstrate a " 'substantial probability' that [their] interest in the fair and orderly administration of justice would be impaired by immediate access." *Planet III*, 947 F.3d at 596 (citing *Press-Enterprise II*, 478 U.S. at 14). Defendants have utterly failed to show how denying access before processing furthers administrative goals, or how court operations would be harmed by expediting access.

33

Defendants' policies, like the no-access-before-process policy in *Planet III*, bear no real relationship to legitimate concerns for orderly administration. *Id.* at 596–97. Defendants argue that their policies fully comply with Florida guidelines for processing complaints, but those standards do not prescribe any functions warranting the delays in Broward County. The relevant performance standards set a goal to provide public access to complaints within two days of filing 80% of the time, but that two-day goal is not tethered to any procedures Defendants must perform before slating complaints for public access. ECF No. 44-6 at 5. The standards do not explain why access should be provided within two days, or what protocols inhibit faster access. Instead, the two-day mark seems to be an arbitrary target grounded in nothing but good practice.

Of course, under the previous iteration of Rule 2.420, Defendant Forman *did* have a duty to review every complaint for confidential information. Thus, there formerly was a legitimate procedure to perform before providing access. The Rule 2.420 amendment, however, relieved Defendant Forman of this responsibility, and she now must only review a small subset of complaints. Indeed, the Florida Supreme Court amended the rule specifically to expedite access to complaints. True, as Defendants acknowledge, because Rule 2.420 still requires Defendant Forman to segregate certain confidential complaints, some level of initial review screening out the confidential complaints would need to occur before placing non-confidential

34

complaints in a public review queue. ECF No. 52 at 2–4; Tr. at 87:11–89:14. But the evidence before this Court suggests that Defendants already have the tools in their arsenal to perform this initial review quickly, efficiently, and in full compliance with Rule 2.420. Confidential complaints are marked accordingly by filers during intake, and the Portal software, Granicus, allows Defendant Rushing to view these tags and determine which filings are confidential. ECF No. 35-1 ¶¶ 29, 39–41; ECF No. 35-3 at 8–34; Tr. at 14:1–18:11, 94:22–96:9. Plus Arizona, using Granicus, recently implemented a public review queue providing access to complaints upon receipt. ECF No. 35-1 ¶¶ 29, 39–41; Tr. at 14:11–18:11, 94:22–96:9. Thus, Defendants cannot justify the delay by relying on Rule 2.420. The fact that Defendant Forman does more review than necessary under Rule 2.420 does not insulate Defendants' conduct from constitutional scrutiny. Rather, this superfluous review further animates how unnecessary the Broward County delays are.

Moreover, Defendants have presented no evidence that denying access before clerical processing somehow protects or furthers quality control and efficient court administration. In fact, the evidence before this Court suggests quite the opposite. *See also Amends. to Rule 2.420*, 320 So. 3d at 627 ("[T]o address timely access to court records . . . the clerk of court does not have an independent responsibility to identify and designate information as confidential."). The crude manner in which Defendant Rushing transmits complaints forces Defendant Forman to tediously

35

review each complaint, which takes considerable time, and in a county as large as Broward County, results in a backlog of filings thereby putting a great deal of pressure and strain on Defendant Forman's office. As the Florida Supreme Court anticipated in amending Rule 2.420, if Defendants provided access before processing, Defendant Forman would no longer have to review every incoming complaint and court efficiency would likely *increase*.

In sum, Defendants' policies denying access before processing in Broward County bear no relationship to legitimate administrative concerns. Accordingly, Defendants' policies fail the first prong of the *Press-Enterprise II* balancing test.

Defendants' policies suffer a similar fate under the second prong as well. Under that prong, Defendants must prove that "no reasonable alternatives exist to 'adequately protect' " the fair and orderly administration of justice. *Planet III*, 947 F.3d at 596. Here, however, there is a reasonable alternative permitting pre-review access—a public review queue made possible by screening for non-confidential Broward County civil complaints. This alternative would greatly expedite access, fully comply with Rule 2.420, and likely enhance the efficiency of court operations. To be sure, both Defendants strongly denounced a public review queue, although neither denied that it would be possible. Tr. at 41:5–42:24, 45:1–5, 87:11–17, 90:14–91:13. But Defendants' concerns over a public review queue are not grounded in

protecting court operations, and instead resemble general anxiety about changing the status quo.[8]

Defendant Rushing opposes a public review queue largely because that would require efforts by the Authority which she views as unnecessary and duplicative. ECF No. 52 at 2–4; Tr. at 87:11–89:14. Because the marked confidential complaints must be screened out before furnishing public access to the non-confidential complaints, and only local clerks are required to maintain the confidential complaints under Rule 2.420, Defendant Rushing maintains that she should not be burdened with reviewing complaints. ECF No. 52 at 2–3; Tr. at 87:11–89:14. Additionally, because Defendant Forman must review the confidential complaints, Defendant Rushing argues that requiring her to also review complaints at the Portal level would result in a duplicative process. ECF No. 52 at 3–4; Tr. at 87:11–89:14.

Now, Defendant Rushing does not argue that faster access to complaints would impair Portal operations. Practically speaking, if Defendant Rushing had to review incoming complaints to provide faster access, that would require more time and effort by Portal staff, but Defendant Rushing failed to articulate how this added

---

[8] Admittedly, "[t]he chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Powers v. Sec'y, Fla. Dep't of Corr.*, 691 F. App'x 581, 583 (11th Cir. 2017) (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990)). But "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury." *Callaway*, 489 F.2d at 576 (5th Cir. 1974) (citations omitted). "The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." *Id.*

step would affect Portal operations. It does not follow that extra work alone would impair the "fair and orderly administration of justice." Additionally, the fact that local clerks must review complaints under Rule 2.420 does not preclude Defendant Rushing from performing the same task, particularly when constitutional rights are at stake. To the contrary, "the Constitution sets a floor for the protection of individual rights. The constitutional floor is sturdy and often high, but it is a floor." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2094 (2019) (Kavanaugh, J., concurring).

Finally, because Defendant Rushing already filters complaints by county and filers select whether a complaint is confidential at the Portal before filing, Defendant Rushing has access to this information, and it does not seem a Herculean task for her staff to filter complaints by county *and* confidentiality status. And, against Defendant Rushing's suggestion, this review would hardly be duplicative of Defendant Forman's efforts. The two reviews perform different functions. Defendant Rushing would simply slate non-confidential Broward County civil complaints for public access, filtering out the complaints marked by the filer as confidential. Then, Defendant Forman later reviews those complaints marked confidential and maintains their confidentiality pursuant to Rule 2.420.

Turning to Defendant Forman, she dismisses implementing a public review queue because it would "disrupt the intricate balance" between the clerks, the Authority, and the allocated budget. Tr. at 40:11–14, 41:5–16, 50:1–25. But

Defendant Forman's concerns speak only to logistical hurdles involved with implementing faster access and, importantly, not to any detriment faster access would wreak on court functions. Plus, if Defendant Forman is concerned about sacrificing her obligations to designate confidential information under Rule 2.420 to accommodate faster access, the First Amendment right runs only to non-confidential complaints, and the recent amendment removed her obligation to review such complaints for confidential information. Thus, Defendant Forman can fully comply with her privacy obligations under Rule 2.420 while simultaneously furnishing faster access to non-confidential complaints.

As a practical matter, both Defendants acknowledge that Arizona has already implemented a public review queue with the same software Florida uses. Tr. at 39:6–42:24, 45:1–5, 87:11–17, 90:14–91:13. But Defendants reject that alternative because it would tinker with the budget and Florida has more counties than Arizona. *Id.* at 41:5–42:24, 45:1–5, 87:11–17, 90:14–91:13. These arguments do not justify the continued delay of the constitutional right of access which, in Broward County, can last several days.

As for the cost of implementing a public review queue in Broward County, Defendant Forman did not provide an amount but simply pointed to Arizona, where it cost $20,500 to install a public queue. Tr. at 42:21–24, 62:23–63:11; ECF No. 48-4. And with that $20,500, Arizona implemented a *statewide* public review queue

providing instant access to complaints filed in all counties. ECF No. 35-1 ¶¶ 29, 39–41. Thus, the only evidence of cost before this Court indicates that implementing a public review queue in Broward County would command a relatively modest sum. Further, Defendant Forman did not point to a particular estimate that would render a public review queue prohibitive. Tr. at 39:6–42:16. Instead, she argued that, as a matter of principle, the filing system should not be altered if such change implicates the budget, regardless of the amount. *Id.* If budget implications of any amount—even a dollar—justified the suppression of constitutional rights, the last two centuries of constitutional jurisprudence would be eviscerated.

Additionally, the fact that Florida has more counties than Arizona is irrelevant when this case concerns only one county's filing practices. While Defendant Rushing operates the statewide access point for filing, a statewide injury is not before this Court. Accordingly, this Court cannot grant statewide relief and order Defendant Rushing to change filing practices across all sixty-seven counties. This may be a different case if, for example, there was a showing that implementing a public review queue for only Broward County would deleteriously impact Defendant Rushing's operations with respect to the other sixty-six counties. But Defendants have provided no such evidence, thus this argument carries little weight.

Of course, there may well be other means through which Defendants could expedite access, but a public review queue has been the only alternative presented

to this Court. By the same token, the constitutional analysis would likely play out differently had neither side proposed an alternative, or the proposed alternative was impracticable. Here, however, the credible evidence before this Court shows that providing access to complaints before process through a public review queue is a workable alternative that would expedite access, protect the integrity of Defendants' court operations, and likely improve the efficiency of such operations. More importantly, it would vindicate Plaintiff's First Amendment right of access. Accordingly, "[t]he ready availability of alternative 'simple measures' to improve access to newly filed complaints" is fatal to Defendants' policies under the second prong of *Press-Enterprise II* as well. *Planet III*, 947 F.3d at 598 (quoting *Courthouse News Serv. v. Planet* (*Planet I*), 750 F.3d 776, 791 (9th Cir. 2014)). Having failed both prongs of *Press-Enterprise II*, Defendants' policies are thus unconstitutional under the Ninth Circuit's approach.

The analysis plays out much the same under the Fourth Circuit's approach as well. Under that standard, Defendants must demonstrate that the delays in access are "content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice." *Schaefer*, 2 F.4th at 328 (quoting *Planet III*, 947 F.3d at 585). In *Schaefer*, the Fourth Circuit reiterated that the public has a right of "contemporaneous" access, which generally means access the same day as filing or, if impracticable, the next day. *Id.* at 328–29. And in that

41

case, the evidence showed that the clerks provided same-day access almost 90% of the time, thereby indicating that same-day access was both possible and practicable. *Id.* at 329. For the 10% of delayed complaints, however, the clerks gave excuses but ultimately "failed to offer facts establishing that any of these explanations did actually cause delays." *Id.* The court noted that the result may have been different if the clerks presented evidence that unavoidable circumstances, like weather or security threats, were correlated with delays. *Id.* But lacking such evidence, the Fourth Circuit held that the clerks caused the delays and accordingly violated the First Amendment. *Id.*

Here, unlike the complaints in *Schaefer*, almost 90% of Broward County complaints are *inaccessible* on the same day as filing. ECF No. 1 at 23. The evidence shows that same-day access in Broward County occurs around 13% of the time. *Id.* But like the delays in *Schaefer*, the delays here are entirely attributable to Defendants' practices and not the product of unavoidable circumstances. As discussed above, the only thing inhibiting Defendant Forman from providing faster access is the fact that her office must scan all incoming complaints for the small percentage of marked confidential complaints under Rule 2.420. And in a county as large as Broward County, this process takes time. But after the Florida Supreme Court amended Rule 2.420, her office is no longer required to perform this mass-level review. Still, because Defendant Rushing transmits all complaints without

filtering, Defendant Forman must review every complaint to avoid shirking her duty under Rule 2.420, and delays in Broward County persist.

And given the infrastructure currently in place, these delays seem entirely preventable. If Defendant Rushing used a modicum of the information collected at the filing stage, her office could aid Defendant Forman in winnowing the confidential complaints from the throng of Broward County filings. That way, Defendant Forman could fulfill her obligations under Rule 2.420 in reviewing only those complaints marked confidential by the filer and not waste time and effort combing through non-confidential complaints.

In short, Defendants' policies are as narrowly tailored as a blunderbuss. Moreover, these no-access-before-process policies are not only unnecessary to the administration of justice but likely inhibit it. Indeed, all signs indicate that amending the current protocols and expediting access would ease tension and enhance court operations. In nudging statewide change, the Florida Supreme Court certainly thought so. The First Amendment "requires courts to make newly filed civil complaints available as expeditiously as possible." *Schaefer*, 2 F.4th at 329. Defendants' policies flout this command in Broward County and consequently fail the Fourth Circuit's standard. Accordingly, under the Fourth Circuit's approach, Defendants' policies are also unconstitutional.

Defendants' no-access-before-process policies fare no better under the traditional time, place, and manner framework. Under that standard, Defendants must show that the delays in access to complaints "[1] are justified without reference to the content of the regulated speech, . . . [2] are narrowly tailored to serve a significant government interest, and . . . [3] leave open ample alternative channels for communication of the information." *Pine v. City of West Palm Beach*, 762 F.3d 1262, 1269 (11th Cir. 2014) (alterations in original) (quoting *Ward*, 491 U.S. at 791). Defendants meet the first prong because, as this Court established above, their policies do not discriminate in granting access to newly filed complaints and are thus content-neutral. *See, e.g.*, *Planet III*, 947 F.3d at 595 n.8.

Defendants' luck runs out under the remaining prongs, however. With respect to the second prong, Defendants' policies, again, are hardly narrowly tailored. Defendant Rushing, much to Defendant Forman's dismay, transmits complaints quickly without filtering. But this does not lead to faster access. In fact, it does quite the opposite. Because Defendant Forman receives bundles of complaints in drive-by fashion, it takes her office a great deal of time to sift through the review queue and furnish public access.

Defendants' practices could be far more narrowly tailored. This is perhaps best evidenced by the Florida Supreme Court's amendment to Rule 2.420. When the Florida Supreme Court amended that rule to ameliorate the delays, Defendants kept

the old customs in place and did not tailor their policies to Rule 2.420's narrowed obligation. Nor have Defendants demonstrated what interest this Byzantine system serves. Surely the interest is not administrative efficiency, for Defendants' practices only foster backlogs in Broward County. And the Rule 2.420 amendment extinguished lingering privacy concerns for Defendant Forman by placing responsibility on filers. Accordingly, Defendants' policies are not narrowly tailored and fail the second prong.

Defendants' policies fall short under the third prong as well, although the analysis is slightly awkward. This traditional three-prong test, of course, is typically deployed in speech cases. And as the Ninth Circuit recognized, the third prong seems inapplicable in the context of accessing complaints because "there is only one way CNS can access the new complaints: the court clerk's office." *Planet III*, 947 F.3d at 596 n.9. Even so, if the third prong applies here, this Court likewise finds that Defendants' policies do not "leave open ample alternative channels for communication of the information" because, in the vast majority of cases, the only way Plaintiff can access non-confidential Broward County civil complaints is through Defendant Forman's office. Defendants' policies thus fail the third prong as well.

Therefore, Defendants' policies denying access before process are unconstitutional under the traditional time, place, and manner framework as well.

And because Defendants' policies fall short under any constitutional standard in this area of First Amendment jurisprudence, this Court need not determine which standard applies. Having concluded that the First Amendment proscribes Defendants from delaying access to complaints before clerical processing, this Court next turns to the remaining preliminary injunction factors.

## B

Recall that the remaining preliminary injunction factors are (1) that Plaintiff will suffer irreparable injury absent an injunction, (2) that the harm not granting an injunction causes to Plaintiff outweighs the harm an injunction would cause Defendants, and (3) that the injunction would not be adverse to the public interest. *Siegel*, 234 F.3d at 1176. Here, the remaining preliminary injunction factors are thoroughly intertwined with considerations already discussed regarding the merits of Plaintiff's claim. On balance, these factors weigh in favor of granting Plaintiff's motion for preliminary injunction.

First, Plaintiff will suffer an irreparable injury absent an injunction. "Where the precious First Amendment right of freedom of the press is at issue, the prevention of access to a public forum is, each day, an irreparable injury: the ephemeral opportunity to present one's paper to an interested audience is lost and the next day's opportunity is different." *Jacobsen v. U.S. Postal Serv.*, 812 F.2d 1151, 1154 (9th Cir. 1987). Though this case arises in a different context, the principle holds true.

Every time Plaintiff loses the opportunity to access complaints—complaints it has a right to access—constitutes an irreparable injury. In the news industry, time is of the essence. Because of the delays in Broward County, Plaintiff cannot access and report on new complaints in a timely manner. Accordingly, this Court finds that Plaintiff has satisfied the irreparable injury prong for a preliminary injunction.

Second, weighing Plaintiff's "serious and substantial" First Amendment injury against Defendants' interest, the scale tips decisively in Plaintiff's favor. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006). That is because the State "has no legitimate interest in enforcing an unconstitutional ordinance." *Id.* And this Court is persuaded that the State's legitimate interest in the administration of justice does not outweigh the harm caused by delaying access to complaints when the State has alternative means to more directly advance its interests in a reasonable way.

Third, and finally, this Court is persuaded that an injunction, at this juncture, would not be adverse to the public interest. Instead, this Court finds that enjoining Defendants from denying access to complaints before clerical processing would advance the public interest in the First Amendment right of access to civil complaints. After all, as noted above, "[t]he public has no interest in enforcing an unconstitutional ordinance." *Id.* at 1272–73 (citing cases explaining that there is no irreparable harm to a municipality in preventing its enforcement of "an ordinance

that may well be held unenforceable" and that the public does not have an interest in the "expenditure of time, money, and effort in attempting to enforce" such an ordinance).

Because Plaintiff has carried its burden as to all four of the preliminary injunction factors, this Court finds that Plaintiff is entitled to a preliminary injunction.

IV

Having determined that Plaintiff is entitled to injunctive relief, this Court must also determine what that relief should look like. Any injunction must give Defendants sufficient direction. "[T]his Court cannot issue an order that is tantamount to saying 'act right.' " *Hand v. Scott*, 285 F. Supp. 3d 1289, 1309 (N.D. Fla. 2018). And "[a] person enjoined by court order should only be required to look within the four corners of the injunction to determine what he must do or refrain from doing." *SEC v. Goble*, 682 F.3d 934, 952 (11th Cir. 2012) (alteration in original) (quotation omitted). On the other hand, while it is this Court's "province and duty . . . to say what the law is," this Court cannot micromanage Florida's state court system. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L. Ed. 60 (1803). Thus, this Court will enter more limited relief than Plaintiff requests. *See Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (explaining that "a

48

court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case" (quotation omitted)).

Before going further, this Court again notes that it finds—as fact—that a readily available and non-cost-prohibitive solution exists; namely, using Florida's Granicus software to create an authority-side public review queue, just as Arizona has done. That said, because "the Government has traditionally been granted to widest latitude in the dispatch of its own internal affairs," this Court will not tell Defendants how they must facilitate timely public review. *Rizzo v. Goode*, 423 U.S. 362, 378–79 (1976) (quoting *Sampson v. Murray*, 415 U.S. 61, 83 (1974)). This Court recognizes that there is more than one way to skin a cat; that is, there may be other, reasonable ways to facilitate timely public review of non-confidential civil complaints. Defendants should be permitted to choose their preferred solution.

In the past, this Court has granted preliminary injunctions that give broad guidance while allowing the State time to develop and submit a remedial plan. *See, e.g.*, *Hand*, 285 F. Supp. 3d at 1309 ("[T]he parties must submit additional briefing as to the contours of injunctive relief, if any, in light of this order."); *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1306 (N.D. Fla. 2017) ("Defendant shall file a plan consistent with the directions this Court listed above.").

This case merits a similar approach. Thus, this Court enjoins Defendants from withholding public access to non-confidential complaints in Broward County before

clerical processing—i.e. Defendants cannot go back to their old policies. Plus, this Court orders Defendants, by a date certain, to confer and submit a plan for providing timely public access to non-confidential civil complaints before clerical processing occurs.

And one final point, this isn't *Who's on First*, Defendants must move past pointing fingers at each other like the spidermen pictured above; this Court fully expects Defendants to *jointly* come up with a plan that will resolve the constitutional deficiencies identified above. Lest there be any doubt, if Defendants return playing the blame game, they will have violated this Order.

V

This Court next considers whether Plaintiff must secure a bond in furtherance of the preliminary injunction. Defendant Forman argues that Plaintiff should be required to post a security. ECF No. 44 at 35. As for the amount, Defendant Forman argues that the bond should be at least $20,500—the amount it cost Arizona to implement faster access through Granicus. Tr. at 42:21–24, 62:23–63:11; ECF No. 48-4. Defendant Forman did not show the cost of implementing a public review queue for Broward County. Tr. at 62:23–63:11.

Rule 65(c) provides that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined

or restrained." Fed. R. Civ. P. 65(c). But "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . . [, and] the court may elect to require no security at all.' " *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.*, 425 F. 3d 964, 971 (11th Cir. 2005) (alteration in original) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)). Moreover, "[w]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *Curling v. Raffensperger*, 491 F. Supp. 3d 1289, 1326 n.25 (N.D. Ga. 2020) (quoting *Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1335 (M.D. Fla. 2009)). Here, while Defendants' First Amendment violation weighs against requiring a bond, that alone is not dispositive. Taken together with evidence that implementing a public review queue would not be cost-prohibitive, however, this Court finds that a bond is unnecessary in this case. Accordingly, in its discretion, this Court waives the bond requirement.

VI

Having determined a preliminary injunction is warranted, this Court next addresses whether it will stay that injunction pending appeal. Stays pending appeal are governed by a four-part test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially

51

injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Venues Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000) (applying the same test). Considering that this test is so similar to that applied when considering a preliminary injunction, courts rarely stay a preliminary injunction pending appeal. That rings true here. Because no exceptional circumstances justify staying this Order pending appeal, *see Brenner v. Scott*, 999 F. Supp. 2d 1278, 1292 (N.D. Fla. 2014) (Hinkle, J.) (issuing a rare stay of a preliminary injunction given the public interest in stable marriage laws across the country), this Court refuses to do so. Defendants have every right to appeal, and this Court sees no reason to delay Defendants in seeking an appeal by requiring them to file a motion to stay with this Court under Rule 62.

## VII

"[T]he First Amendment guarantees of speech and press . . . prohibit government from summarily closing courtroom doors which had long been open to the public . . . ." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980). This right of access is foundational to the function of our judicial system; "[p]ublic access to complaints allows the public to understand the activity of the . . . courts, enhances the court system's accountability and legitimacy, and informs the public of matters of public concern." *Bernstein*, 814 F.3d at 141. Conversely, limited public

access leads to "incompetent legal reporting," which "fuels . . . anticourt sentiment and fosters inaccurate views of the actual workings of the judicial system." Luberda, *supra*, at 510.

Broward County's filing system frustrates the press and public's right to monitor their local judiciary. And, beyond inertia, Defendants offer little to nothing in support of that system. That will not do. Because Defendants' policies unnecessarily inhibit the public's right to monitor the judicial system,

**IT IS ORDERED**:

1. Plaintiff's motion for preliminary injunction, ECF No. 35, is **GRANTED**.

2. **On or before June 24, 2022**, Defendants shall confer and file a plan for providing timely public access to non-confidential civil complaints consistent with the directions this Court listed above. Defendants must include specific timetables.[9] Once this Court approves Defendants' plan, this Court will then issue an injunction directing them to comply with their plan. And once this Court issues its injunction, it will require Defendants to file updates to make sure their benchmarks are met.

**SO ORDERED on June 10, 2022.**

<u>s/Mark E. Walker</u>
**Chief United States District Judge**

_____

[9] While Defendants must move with alacrity, this Court will entertain well-founded motions for extensions.